IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARY L. THACKER, etc.,

                        Plaintiff,                   Case No. 3:05 CV 7285

    -vs-

                                                     MEMORANDUM OPINION

DAIMLERCHRYSLER CORPORATION,
et al.,

                        Defendant.

KATZ, J.

This matter is before the Court on motions for summary judgment filed by defendants DaimlerChrysler Corporation ("DaimlerChrysler" or "Daimler") (Doc. 51) and Wackenhut Corporation (Doc. 59). Also pending are multiple responses by the parties (Doc. 64, 72, 79, 86, 90; Doc. 65, 74, 80) and Wackenhut's motion to strike an affidavit (Doc. 81). This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I. Background**

DaimlerChrysler contracted with Wackenhut Corporation to provide security at DaimlerChrysler's Toledo, Ohio Jeep plant. Pursuant to that agreement, Wackenhut had assigned two guards as patrol officers at the plant, part of their duty being to inspect for unlocked doors or rooms. The Security Officers' Handbook states that the company's mission is to "endeavor to protect employees" by "observing irregular or unusual conditions and activities." Handbook, Doc. 65, Ex. 8 at 26. The handbook discusses inspection for "incendiary or explosive materials carried into the client's premises," *id.*, and "possession of firearms or other weapons," *id.* at 27; enforcement against "possession of weapons," *id.* at 43; and recognition of murder as a crime

which may occur on a client's premises, *id.* at 41. Further, Wackenhut security guards were required to and did receive training in workplace violence.

As of 2005, Myles Meyers had been a production employee at the Toledo plant for approximately 22 years. During his tenure at DaimlerChrysler, the following relevant incidents involving Meyers occurred: his girlfriend, also an employee at the plant, complained to at least one supervisor about Meyers' drug use, threats, and verbal and physical abuse, Martin Dep. at 24-25; several warnings for absenteeism; a history of drug use on the job; reports from a longtime friend and another DaimlerChrysler employee that Meyers was in need of behavioral assistance, Maxon Dep. at 72-74; accusations of wrongdoing against his supervisor Toney that were investigated and found untrue; reprimands for poor performance; and various altercations with supervisors and fellow employees. In one instance, Meyers wrote a note threatening to "kick [a fellow employee's] ass." Cousino Dep. at 16-17. That note was given to Meyers' supervisors. *Id.* Meyers reported that he felt his supervisors, team advisor Roy Thacker ("Thacker") and area manager Mike Toney, were targeting him. Conway Dep. at 32, 35. Prior to his employment at DaimlerChrysler, Meyers had served three years in prison for various offenses. Daimler conducts background checks on employees, including checks into criminal history. Maxon Dep. at 97-99. During his employment at Daimler, but unbeknownst to his supervisors, Meyers had been charged for possession of a loaded gun in his vehicle. McClain Dep. at 53. He was awaiting sentencing on that charge when he committed the heinous acts underlying this case. Finally, the plaintiff offers expert testimony that many of these situations and conditions were significant and well-known by Daimler and its employees and should have been a warning with regard to potential violent behavior by Meyers.

2

The general facts concerning the shooting do not appear to be in dispute. They are chilling and tragic. On Wednesday, January 26, 2005, Myles Meyers entered the Toledo North Assembly Plant sometime shortly after 8:30 p.m. during the second shift lunch break.

Meyers was scheduled to work on that day in the plant's body shop during second shift between 4:00 p.m. and 12:30 a.m. Meyers entered through the body shop turnstiles using his employee key access card. Under his hooded jacket, Meyers was carrying a 20 gauge shotgun that he had suspended from his body using a wire harness and a pink stuffed animal to relieve the pressure of the harness.

Meyers' employee access card, which allowed 24 hour access to the plant, gained him entry into the plant. He then was able to enter the supervisors' cubicle area because Daimler employees had wedged open the door to that area and taped over the lock that would have kept that door closed and restricted access to persons with a supervisor-level access card. In that area, at about 8:34 p.m., Meyers confronted body shop material advisor Yiesha Martin. Meyers displayed his shotgun, advised Martin that he wished to do her no harm, but indicated that he intended to kill Thacker, Toney, and body shop advisor Carrie Woggerman, after which he intended to kill himself. Meyers ordered Martin to contact Toney by radio and summon him to the office, which Martin did. Shortly thereafter, both Thacker (Meyers' supervisor) and Toney (Thacker's supervisor) arrived at the body shop office and, as they approached Martin's cubicle, Meyers opened fire, killing Thacker and wounding Toney. Meyers then emerged from the body shop office onto the plant floor where he encountered team leader Paul Medlen and shot him. Meyers then retreated into the body shop office, sat down within a cubicle, and ended his life with his own shotgun.

**II. Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

Mary Thacker brought this suit against DaimlerChrysler and Wackenhut Corporation as personal representative of the estate of Roy Thacker on July 8, 2005.

**III. Discussion**

    **A. Claims against DaimlerChrysler**

At all relevant times herein, DaimlerChrysler was a complying employer under the Workers' Compensation system of the State of Ohio. As such, DaimlerChrysler is entitled to immunity under Section 35, Article II of the Ohio Constitution and Ohio Rev. Code § 4123.74 unless the plaintiff can demonstrate that her damages resulted from an intentional tort on the part of DaimlerChrysler. *Blankenship v. Cincinnati Milacron Chemicals*, 69 Ohio St.2d 608 (1982).

In *Jones v. VIP Development Co.*, 15 Ohio St.3d 90 (1984), the Ohio Supreme Court defined the employer conduct necessary to establish an intentional tort for which the employer would not be immune as follows: "An intentional tort is an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." *Id.*, syllabus ¶ 1. In *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100 (1988), the Ohio Supreme Court expanded on the meaning of "substantial certainty." The court stated that:

> Subsequent to the majority of this court's determining in *Jones* that an intentional tort should be measured by the yard stick of 'substantially certain to occur,' trial courts have been led to misconstrue such phrase, transforming negligence cases into intentional tort cases. Claims in a number of cases have been based upon injuries caused by some degree of negligence on the part of the employer. These have ranged from simple negligence to reckless and wanton disregard of the duty to protect the health and safety of employees, none of which presents an act which is substantially certain to occasion injury.

*Id.* at 115. The court adopted a test for intentional tort by an employer in *Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115 (1991).[1]

> Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed. 1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against an employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process,

---

[1] As noted in *Medlen v. Meyers*, 476 F.Supp.2d 797, 801 n.2 (N.D. Ohio 2007):
> After the decision in *Fyffe*, the Ohio General Assembly enacted O.R.C. § 2745.01 to abrogate the standard announced in *Fyffe*. The Ohio Supreme Court held § 2745.01 was "unconstitutional in its entirety." *Johnson v. BP Chems., Inc.*, 85 Ohio St.3d 298, 308, 707 N.E.2d 1107 (1999). The General Assembly then enacted a revised version of § 2745.01 effective April 7, 2005. Because the statute was not effective on January 26, 2005, the date of the shooting, the *Fyffe* standard is applicable.

6

> procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph 5 of the syllabus, modified as set forth above and explained.)

*Fyffe*, supra, syllabus ¶ 1. The "knowledge" referred to in *Fyffe* is "actual knowledge," *see, e.g., Lucas v. RCA Rubber Co.*, 93 Ohio App.3d 389, 391 (1994) and *Cross v. Hydracrete Pumping Co.*, 133 Ohio App.3d 501, 507 (1999), and must be supported by competent evidence, *Youngblood v. Whirlpool Corp.*, 99 Ohio App.3d 740, 747 (1994).

The law as pronounced in *Fyffe* was not intended to apply directly to humans. *See, e.g., Kerans v. Porter Paint*, 61 Ohio St.3d 486, 495 (Ohio 1991). A human is not a "process, procedure, instrumentality,[] condition," or "task." *Fyffe*, supra. When applying the *Fyffe* standard to a case of workplace violence by an employee, courts must consider that an employer may not program and isolate a human as it can a machine or other workplace hazards contemplated by *Fyffe*. The standard applied by a court should contemplate that employers cannot treat humans exactly as they treat machines, and so the care required by employers with regard to a human is not exactly the kind or type of care required with regard to a machine or spill or structure. A court must be cognizant of the additional risks and dangers a human can pose because humans possess volition and potential instability in a way that no other workplace hazard can. The least an employer can do is be vigilant and cognizant of warning signs that employees display, and treat them sensitively and effectively as they arise. Such is the idea, at least, behind efforts such as Daimler's workplace violence prevention program. However, as discussed herein, when the warning signs are known by the employer, and are visibly displayed by an employee, but the employer fails to act on them to isolate or prevent potential violence, there is not much less

that a company can do with regard to preventing workplace violence. DaimlerChrysler ignored the warning signs that were obvious and known by various employees, including supervisors. Daimler kept Meyers untreated, on the job, and working with the same people to whom he displayed animosity. Daimler did little, if anything, to prevent workplace violence.

DaimlerChrysler argues that there is no genuine issue of material fact that DaimlerChrysler did not have actual knowledge that Meyers was dangerous, that the plant's security was so inadequate that it was dangerous, and that DaimlerChrysler's allegedly deficient workplace violence prevention program created a danger that made it substantially certain that Meyers would injure other DaimlerChrysler employees. Daimler argues that, while many of the warning factors listed above may have existed, they were known by various people and not all by one comprehensive person or department that could have recognized Meyers as a danger, and that therefore DaimlerChrysler lacked actual knowledge. In the first instance, there is a question of fact as to whether Daimler's workplace violence prevention program was adequate in that: some employees with information about Meyers' behavior did not report their knowledge to anyone, the information that was reported to supervisors was not gathered by any central department or employee, and Meyers' criminal history was basically ignored or at least isolated and his gun-related sentencing was not known by anyone at Daimler until after the underlying incidents in this case. If the goal of the program was to watch for signs of potential workplace violence, then even by its own standards, it woefully failed to do so in Meyers' case. There is a question as to whether the information was all there, in the possession of various Daimler employees, but it was not fully centralized, and the information that supervisors did have was inadequately acted upon, if at all.

The law does not require for a finding of liability that a single employee or unit of DaimlerChrysler had the actual knowledge of danger, but rather that the company itself or its employees or units had actual knowledge. What DaimlerChrysler advocates would create a black hole in the law where intentional tort claims against employers would be impossible to prove so long as a single unit or department of the employer did not have all the information that various units of the employer had with regard to a substantial certainty of danger. Indeed, such a holding would create an incentive, from an intentional tort perspective, for employers to decentralize their knowledge of workplace dangers. There is no support in the law for such a proposition, and this Court declines the opportunity to adopt one.

There are genuine issues of material fact as to whether DaimlerChrysler, by way of its various employees and in accordance with its workplace violence protection program, actually knew that Meyers posed a danger to his supervisors, including Thacker, to a degree of substantial certainty. There is also a question of material fact as to whether Thacker was required to work with Meyers, by virtue of Daimler's keeping Meyers without discipline and without recommending treatment, on the job as a regular employee, and under the supervision of the same supervisors against whom a reasonable jury could find Meyers demonstrated a personal vendetta,[2]

---

[2] The Court is aware of the divergence of this opinion with a decision by Chief Judge Carr in a matter arising from the same underlying incident. *See Medlen v. Meyers*, 476 F.Supp.2d 797 (N.D. Ohio 2007). This Court does not necessarily disagree with any part of the *Medlen* decision. From this Court's perspective, the reason for the difference between this case and *Medlen* is largely one of evidence. Certain facts were brought to this Court's attention that were not part of the *Medlen* decision. At the summary judgment stage, the evidence that a plaintiff can produce is crucial, as discussed herein, because the evidence is to be viewed in the light most favorable to the non-movant. The evidence in this matter that arose from depositions and other discovery, but which was not part of *Medlen*, includes Daimler employees' knowledge of Meyers' threats, criminal history, and warnings of potential instability. The plaintiff's case in *Medlen* sought to

(continued...)

Daimler further argues that, even if all the evidence advanced by Plaintiff is taken as true, Plaintiff still cannot meet the burden imposed on her by *Fyffe*. In *Taylor v. Orlando Banking Co., Inc.*, 2003 Ohio 6165, 2003 WL 22724710 (Ohio Ct. App. 2003), a state appellate court upheld the denial of summary judgment against a plaintiff who was punched by a fellow employee at the workplace, despite evidence that the assaulting employee "was previously reported for yelling and swearing at her supervisor, was disciplined for being argumentative, and threatened another employee . . . to 'shoot her in the head with a nine millimeter.'" *Taylor* at ¶ 14. The court reasoned that this behavior was insufficient to create knowledge of a "dangerous condition" and cited *Bosse v. Rare Hospitality*, 2002 WL 1724053 (Ohio Ct. App. 2002), which held that

> while there was some evidence that [the assaulting employee] was "high strung" and "stressed," there was nothing to suggest that he would commit the assault on [the plaintiff]. [The assaulting employee] had no criminal record of violent behavior. He had no prior violent behavior at [the workplace], though he had engaged in some "verbal altercations" with other employees. There was simply not a scintilla of evidence that [the employer] should have known that [the assaulting employee] would be violent, and that harm to [plaintiff or others] was substantially certain to occur.

*Bosse* at ¶ 6.

This Court notes that there is significantly more evidence here than in these and other cases cited by the defendants. *See, e.g., Jasinski v. Ford Motor Co.*, 1992 WL 14419 (Ohio Ct. App. 1992) (granting summary judgment to employer where evidence showed assaulting

---

[2](...continued)
survive summary judgment only on the basis of Meyers' "attendance violations," "temperamental 'outbursts' and [occasional] 'out of control'" behavior, but primarily on a statement attributed to Meyers that he was "'going to get' the plaintiff and others." *Id*. at 800. As is clear throughout this opinion, Plaintiff Thacker has shown much more in terms of warning signs for workplace violence attributable to Meyers, and further that employees of Defendant DaimlerChrysler had actual knowledge of such information.

10

employee had been disciplined for verbally threatening a supervisor, being away from his work station, and taking a break at the same time as another employee); *Reed v. Armco, Inc.*, 2000 Ohio App. LEXIS 6153 (Ohio Ct. App. 2000) (affirming summary judgment for employer where plaintiff did not report incidents of harassment and pranks (but not physical assault) by other employees, and those incidents that were reported were investigated by the employer). Again, this Court, viewing the evidence as it must in favor of the plaintiff, bases its decision on evidence that: an employee at the plant complained to a supervisor about Meyers' drug use, threats, and verbal and physical abuse; Meyers was warned several times for missing work and poor performance; Meyers had been accused of drug use on the job; at least two people, including an employee, reported that Meyers was in need of behavioral assistance; Meyers falsely accused Toney and Thacker of misconduct towards him; Meyers had various altercations with supervisors and employees; Meyers threatened to "kick [a fellow employee's] ass" in a note shared with supervisors; and Meyers had served three years in prison for various offenses before working at Daimler and had been charged for possession of a loaded gun in his vehicle while employed at Daimler, a company that conducted background checks of employees. These pieces of evidence pose genuine issues of material fact, as discussed above, and should be presented before a trier of fact.

### B. Claims against Wackenhut

Wackenhut is subject to liability if it was negligent in performing its duties at the plant. Wackenhut argues that it owed no duty to Plaintiff for the criminal acts of Meyers, because such acts were not foreseeable. *See Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St. 3d 75, 77

(Ohio 1984).  "The test for foreseeability is whether a reasonably prudent person would have anticipated an injury was likely to result from the performance or nonperformance of an act."  *Id.*

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Hill v. Sonitrol of Southwestern Ohio, Inc.*, 26 Ohio St. 3d 36, 39 (Ohio 1988) (*citing* Restatement of the Law 2d, Torts § 315 (1965)).  Such a duty can arise from a security contract.  *Id.* at 39-40.  In *Hill*, cited by Defendant Wackenhut, the Ohio Supreme Court found no special relationship between the security company and the employee injured at the workplace because the contract specifically provided that the security company was only charged with protecting the premises after all employees had left.  The injury to the plaintiff arose while the employee was on premises.  The contract in that case applied only to protect the premises itself.

Here, the opposite is true.  Wackenhut was contracted to provide security for the premises and for Daimler employees (such as Thacker) on a full time basis.  The contract's stated purpose was "to provide an efficient and full-time uniformed fire/security service for the protection of DaimlerChrysler Corporation's . . . facilities, property, and personnel. . . ."  Doc. 65, Ex. V at 1.  One of Wackenhut's contractual objectives was to "control personnel and vehicle access to and egress from the plant facility."  *Id.* at 12.  The contract specifically contemplated "workplace violence," *id.* at 5, as did the Wackenhut employees' handbook.  The latter indicates Wackenhut strives "to protect employees" by "observing irregular or unusual conditions and activities," including incendiary devices and firearms."  Handbook, Doc. 65, Ex. 8 at 26-27.  Yet on the day

12

of Meyers' attack, there was no review of his entry or mechanism or procedure for detecting a firearm. Wackenhut's basic defense is that it took all directions from Daimler as to how, where, and when to provide security services. Wackenhut claims that it cannot be held liable for failure to secure the premises or detect Meyers that day because it was Daimler employees who directed security measures at the plant, and it was Daimler employees who, for instance, left the access to the management cubicle area unlocked, allowed Meyers 24-hour access to the plant during non-work hours, and continued to fully employ Meyers.

The contractual language is clear that Wackenhut owed a duty to Thacker as a Daimler employee at work during work hours. There are also genuine issues of material fact as to what exactly Wackenhut's security protocols were, and what Daimler employees did to exercise control over Wackenhut's actions by perhaps thwarting Wackenhut from exercising its security duties (i.e., who did what to breach the duty owed to Thacker). For example, there is a question of whether and to what extent Daimler or Wackenhut directed or was involved in the practice of leaving the management area unlocked, allowing unconditional access to the premises to disciplined employees such as Meyers, or the sparse monitoring of the entryway when Meyers approached the plant with a shotgun concealed by a wire harness, hooded jacket, and a pink stuffed animal within sight of the monitoring cameras. Wackenhut is unable to show that it lacked a duty to Thacker, and it is likewise unable to show it did not breach such duty. If blame is to be apportioned between the parties, it is best left to a jury, because neither Daimler nor Wackenhut has met its burden of showing that there are no genuine issues of material fact with regard to Plaintiff's employment intentional tort or negligence claims, respectively.

**IV. Conclusion**

For the reasons discussed herein, Defendants' motions for summary judgment (Doc. 51, 59) are hereby denied. Defendant Wackenhut's motion to strike (Doc. 81) is hereby denied as moot.

IT IS SO ORDERED.

                 s/ *David A. Katz*
                 DAVID A. KATZ
                 U. S. DISTRICT JUDGE